The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons have in any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Good morning, Your Honors. May it please the Court. Thank you for this opportunity to give an oral argument on this case. Let me start with saying that the Arrakis case v. Commissioner, which is a turning point that the Fourth Circuit used to change the rules when it came to studying and deciding whether someone is disabled by fibromyalgia. It was a huge sea change and a very important decision because prior to that, it was very, very hard in spite of a regulation or a Rule 12-2P that found that you could have a disability for fibromyalgia. Before that, it was very difficult to prove. The reason is that fibromyalgia does not have objective signs and so my experience as a Social Security attorney is that it was very hard to convince a judge that to go past the objective signs and to look at the subjective complaints. Routinely, those cases were denied. Arrakis was a real sea change and it took a lot of guts to change and specify specifically that we will look not at objective changes but look at the subjective complaints of the claimant to see whether or not they are entitled to disability. For those of us with the exciting lives of Social Security lawyers, we actually remember where we were when we saw the Arrakis case for the first time. I know that's hard to believe but for those of us who handle these cases for claimants, as I said, it was a huge deal. What we found though is that judges still have trouble applying it as in this case. It was such a big deal as a case that I ended up doing a presentation for the local bar association and I called it, what is the ruckus about Arrakis because it was a dramatic change from what the system was before that. What the court also said is the administrative law judges can't cherry pick. They can't look and tease out certain things and say that person can work because they had a good day. There's an understanding that this waxes and wanes, this condition, and so that one day you can have a perfect examination and the next day or week later because of a flare, you can actually have more problems. This case, in addition to being a FIBRO case, is also a case that is so old that there's a rule called the treating physician rule that applies. What that means is prior to 2017, the judge was supposed to be giving greater and substantial weight to the decision of the treating physician or the recommendation or the opinion of the treating physician. Because this case actually started in 2013, the treating physician rule applies. What's important here is if the judge finds that the treating physician rule doesn't apply, that the opinion is not to their liking, then there's six factors that have to be considered after denying the treating physician rule. In this case, one of our arguments is that once it was determined or once the judge decided that she wasn't going to give great weight to the opinion of the treating physician, there's no analysis. Which physician was that? That was Dr. Nassari. Dr. Nassari actually had a couple of opinions, but I had sent him a regulation listing 14.09. In there, he found that she was disabled under the listing as it was. If the judge did not agree with the treating physician rule, then the judge needed to go through the six steps, the six factors that are considered. I thought the ALJ said that part of the problem with Dr. Nassari's opinion was that there was no quantification of what the limitations were. One percent, 90 percent, that that was part of the problem. Well, the way that the 14.09.D is written, it doesn't quantify specifically. It asks whether it's marked. And the judge found, or rather, Dr. Nassari found that it was marked. We had sent him what marked meant. We sent him that information, and then we have to ask judges, or rather doctors, to complete what they have. He found that there was marked limitations on the three factors. What does marked mean? That's the difficulty I have with this particular form, is looking at it, I can't tell what degree of limitation there is. Marked would be a substantial limitation. There's four levels, and extreme is one, and then marked, and then there's lower than that. Moderate. Marked limitation here means that it's affecting somebody in a daily basis, in a significant enough fashion, that they would have the limitations that are checked off in the three sections. The regulations actually define marked, and it has to be something of a substantial nature. And then if the judge didn't agree with that, you just can't ignore it. Then you look for other evidence that would show that she had the marked limitations on a daily basis. And there are many references, many other statements in the record that show that the condition was marked. There are comments, for example, on page 763 of fatigue, problems with her eyes, mouth soreness, muscle spasms. These are in Dr. Nassari's notes. The question is, if it's marked, then it is of the severity that it will affect their ability to work on a daily basis and to complete tasks on a daily basis. So how do you tie that to, in this case, the ALJ said, you can do certain things, but you have limits. You can't do this, you can't do this, but you can do this to certain limits. How do you tie those two together? I'm not understanding how you get from marked limitation to limits, which may very well recognize marked limitations. It seems like to me there's something of a, you seem to be arguing it's marked limitations, that's the end of it. No, there has to be justification in the record for that. And there are many examples of that. And there are even examples, for example, in this case, there was an evaluation done. For example, let me just give you, on page 761, Dr. Nassari talks about the chronic condition she has, joint pain, stiffness, swelling, rash, and fatigue through her entire body. So the marked finding is not in a vacuum. There was a very unusual thing that happened here in that Social Security sent my client to a doctor who found that she was disabled in a consultative evaluation, and then two months later they sent her again for an evaluation to the same office, and the doctor said she was a malingerer and said there were no objective findings, which is hard to believe that a neurologist would say because there are no objective findings for fibromyalgia. So she was looking for something that she couldn't find. But on page 617, 616 and 617, is the report from Dr. Singh for the consultative evaluation. And what's important here is that the judge, the administrative law judge, basically said this was a conclusion that she's disabled, and that job is the job of the judge. That is correct. But if we go a little bit above that, there were signs that are consistent with what Dr. Nassari says. He finds that she has power diffusely weak, slightly weaker on the left, tenderness to percussion of the neck and low back, hypoflexia all over. She has decreased sensation at the C5-6, and her gait is off. She's walking to avoid pain. That's what antalgic gait is. So even if we don't accept the conclusion because it says disabled, we can't ignore the facts. For example, Dr. – Is it your bottom line claim that Ms. Holtz is disabled because of fibromyalgia, or because she's got all kinds of ailments? It's the fiber. So that's one of the things I find confusing here. She has so many ailments. You read through the opinion. The ALJ seems to go through ailment by ailment, and I'm having difficulty figuring out, well, how do you separate the fibro as a defining disability cause from all these other things that she has if – It's almost as if you're arguing if a claimant says they have fibro, that's it. No. I'm not saying that at all. There has to be documentation in the record of the substantial complaints. Many of the conditions that come from fibro are the ones that you see as additional. For example, the brain fog, the depression, many of the other things are consistent with fibro and a result of fibro. So I only have eight seconds left, so I would stop here unless you want me to explain anything else. I'm fine, thank you. Thank you, Mr. Cronin. Thank you. Mr. Johnson. Good morning, Your Honor. Good morning. May it please the Court. My name is Joel Johnson, Special Assistant to U.S. Attorney, representing the Commissioner of the Social Security Administration. Although Ms. Holtz and her counsel attempt to make this case about fibromyalgia and analogizes it to the Arrakis matter, this case is not the same as Arrakis. Here, in contrast, the ALJ provided a thorough discussion of the evidence which showed reliance on all the evidence and multiple inconsistent opinions and information contained in the record and reconciled that inconsistent information. Counsel, is fibromyalgia, it's undisputed that's the diagnosis, is this correct? It is undisputed that Ms. Holtz has a severe impairment to fibromyalgia. That's undisputed, correct? In response to the opening argument, I would say this is not a fibromyalgia case in the sense that Arrakis was. It has to be because she has that it's undisputed that's a diagnosis. You can't get around that. Well, that's not the part I'm disputing. What I'm saying is Dr. Nasseri, her treating provider, while he did provide, I will respond directly to something counsel said on page 761 of the record, that there is an opinion from Dr. Nasseri about fibromyalgia. That page is not about fibromyalgia. That is about lupus and the symptoms of lupus. So when I say it's not really about fibromyalgia, I'm basing that on the treatment records from Dr. Nasseri. My point is that my friend and colleague, Judge Agee, was asking about all the other things. The answer is yes, but that doesn't matter to that extent in terms of Arrakis, in terms of it is undisputed that this fibromyalgia is her diagnosis. That's undisputed. It is a diagnosis. It is a severe impairment. Right. And you agree that it can be shown by her subjective complaints. I don't believe that can be shown by her subjective complaints. I didn't say alone. I said it can be. Can it not? Well, the record shows inconsistency in her subjective complaints. Now, I understand in plaintiff's brief Ms. Holtz testified three different times. Well, you do know it waxes and wanes. That's a part of it. Some days you feel good. Some days you feel horrible. That's part of the diagnosis and the symptoms, is it not? But in this particular case. But answer my question. Is that not a part of the symptoms, that it waxes and wanes? For some people it can be. That's part of the diagnosis and the symptoms of it. Well, fibromyalgia is not in and of itself a disabling condition. Oh, I see. So you still could. You know I was on that case. I guess you know it by now. I'm sorry? Your Honor. Arrakis, you know, was on the panel. I am aware of that, yes. Yeah, right. And so what you're telling me now. Tell us what we said. You said that what? The distinction I'm making here with the Arrakis matter. In Arrakis there was a specific treating physician who offered specific functional limitations about what fibro was limiting that claimant to do. What we have here is a record where plaintiffs saw a rheumatologist for fibromyalgia and lupus. And looking at the treatment records, Dr. Nasiri's primary concern throughout the treatment records was not fibromyalgia. It was lupus. He prescribed Lyrica for Ms. Holtz, which she specifically said over and over again. As a conceptual matter, when you're dealing with fibromyalgia, it's clear that an ALJ has to consider the claimant's subjective complaints. Yes, and I believe. So how do you envision that the ALJ goes about doing that? Well, in this particular case, the ALJ can look at inconsistencies in the record because what we have here is Ms. Holtz telling her treating providers that she's very active, that she's going out, that she can shovel snow, that she can play with her kids. She rejected getting steroid injections because she was too busy. At the end of the day, how is the ALJ to weigh all this? How do they end up coming to a decision? Well, the ALJ's responsibility is to review the entire record and look at all of the information and determine where those inconsistencies may lie. If an individual is telling an ALJ that they can't do anything but their treatment records are showing that they're far more active than they're suggesting that they are, that is how an ALJ can reconcile such an inconsistency in the evidence. Here we have Ms. Holtz not testifying but telling her treating providers that she's quite active. One day she refused knee injections because she was too busy to receive them that day. She talked about going out and walking and climbing, whatever type of climbing that may be. So that's what the ALJ is looking at. In terms of contrasting this case to Arrakis, what we don't have here is the ALJ 1 relying on any objective evidence to discount her subjective complaints. What we have here is a 26-year-old woman, a very young person who the ALJ looked at and said, yes, you are severely limited. He limited her to sedentary jobs based on other treating providers who said that she could sit continuously for 8 hours on a workday, and sedentary jobs primarily involve sitting. So what the ALJ did here was give a 26-year-old person an incredibly highly limiting RFC to account. And specifically on page 954 of the record, the ALJ specifically says to account for her fatigue and joint pain, I am making the RFC finding this way. So the ALJ specifically accounted for fatigue and joint pain. The ALJ was not persuaded that they were as limiting as alleged by Ms. Holtz in her testimony because there are treatment records that show she was telling her provider she was not that limited. And, of course, we have conflicting opinions throughout the record, including the consultative examiners, Dr. Singh and Dr. Sawney, one of whom broadly contends she's simply disabled. So what's the ALJ to do with all those conflicting opinions? Again, as this court has recently explained in the Drumgold decision, the ALJ is the one responsible for looking at all the evidence and trying to reconcile those inconsistencies because two consultative examiners had entirely opposed opinions, one of whom says she's disabled, one of whom says she's probably malingering and that she needs to see a psychiatrist. So the ALJ has to consider that information. And here the ALJ did not give much weight to those in the same way that . . . Was there a malingering scale done? I'm not sure based on . . . It's not in the record, is it? Well, on page . . . Is there in the record? Was there a malingering scale done? Is it in the record? I am not sure, Your Honor. You're not sure of the record? On page 621 is where Dr. Sawney believes Ms. Holtz is malingering. Yeah, he believes. What, did this come out of the air? Oh, I believe she's malingering. What do we do with that? There's a malingering scale that you put patients through to come with an objective score when you do that other than just saying I believe that. But the point is that isn't it true that . . . That's what so . . . And that's what in the Rockets what we did. We sort of took the mysticism out of the diagnosis because it is rather strange. But it says physical exams don't produce clinical laboratory abnormalities and usually yield full range of motion, no joint swelling, normal muscle strength, in terms of neurological reaction. It's a strange disease. It doesn't present with those objective findings you normally have. That's why we said today we joined the circuit and said that you can't discount the claimant's subjective complaints. As a matter of fact, you can't even use this medical diagnosis because it simply has no relevance to the severity, to the persistence, or the limiting effect of the claimant's fibromyalgia. Objective indicators such as the normal clinical and laboratory results simply have no relevance to the severity, the persistence, or limiting effects of the claimant's fibromyalgia. That's what we said clearly, unmistakably in that opinion. But it's not what the ALJ did here. It did. You're telling us now because somebody said, I think she's malingering. So what? I'm mentioning that as an inconsistent opinion. Dr. Nasseri thinks she's disabled. That's not an opinion. Somebody else thinks she's disabled. Is that clinical? I would call it a clinical opinion. It was just right in there. I think she's malingering. Well, why do you think that? He didn't say, I think she's malingering. And then that will overcome this devastating diagnosis that clearly it just does not present like people want it to be. In other words, it's like telling somebody, not in this case, but just hypothetically, somebody that's suffering from chronic depression, just cheer up. It doesn't work that way. You just can't cheer up. That is the diagnosis. That's the symptoms of it. I'm not talking about that, but I'm talking about the analogy of it. And that's why it was a watershed opinion. And it is the opinion of the Fourth Circuit. Yes, Your Honor. And this panel can't overturn that. I am not suggesting that this panel should overturn Arrakis. However, I'm saying this case is quite different than the circumstances of Arrakis because what we have here is an ALJ who not once relied on objective evidence in discounting plaintiffs' subjective complaints. He used her own statements to her providers about how active she was. Because she's honest about the days of waxing and waning. But that's not what the record shows here. Dr. Nasseri's treatment records mention lupus flares and mention symptoms of lupus. This record is eight years of treatment records, and only once did Dr. Nasseri say this might be a fibro flare. So this record does not contain... It doesn't have to be. Do you realize that in terms of there is no treatment for fibromyalgia? There's no cure. But it also doesn't mean that her symptoms are waxing and waning. Am I right about there's no cure? I am not aware of a cure for fibromyalgia. That's right. So why would a person just continue to go to the doctor? That's why you have spurts of, well, I'm just going to power through this because every time I go and somebody tells me he has the same diagnosis, wax and wane. She's honest about it. The days when it's waning, therefore, she has young children. She doesn't want to go to a cave and just go away. She wants to be active. So she's not malingering. She's telling you the truth about it. But it's a devastating disease, and that's why it needed this jurisprudential protection in these cases. This case is not the same. Well, you said that, but, you know, it's... Simply because she has a severe impairment of fibromyalgia does not mean she is disabled. The ALJ has to use information from the record to figure out what her functional limitations are. Getting back to Dr. Nasseri's one-page form that he didn't even fill out correctly, this tells us nothing about what Ms. Holtz can still do. Didn't one of your consulting physicians say that she was disabled? Your consultation? A broad, conclusory opinion that she was disabled. And then you went to somebody else and found another one? Who said she was malingering. Okay. So why did you get a second one? Because you didn't like the first? I don't think that was the reason. Maybe the third would have been two or three. I don't think the government had any incentive to try to find conflicting opinions. These are the opinions that were before the ALJ utilized. I asked the question, why did you have another one? After you had one that said she was disabled. You picked a consultant. The broad statement that she's disabled has no actual value to the ALJ. It has no value? Correct. Your consultant has no value when they say they are disabled. I thought that's what you wanted to do to help the people in terms of it is an agent to determine fairly what a person's disability is. And when you get somebody to be a consultant, you say that's not something you need. What the ALJ needs to see is actual functional specific limitations. The ALJ is not helped. It needs to be objective? Medical findings? Well, there have to be some objective findings, just like Dr. Nasseri is treating this person for lupus and fibromyalgia. Lupus has objective indicators. Fibromyalgia does not. So Dr. Nasseri is in the same position. And all of his notes are about lupus, not about fibromyalgia. This record does not contain a waxing and waning of fibro. It doesn't contain complaints. That's because once you make the diagnosis of fibromyalgia, then that is the diagnosis. Because there are other things you're treating, you continue to do that. So you're saying, oh, because he was only talking about lupus, that's because that's the only thing that he had a treatable, clinical way to deal with. The fibromyalgia she had to live with. That's not correct. She was taking Lyrica and repeatedly noted throughout the record that Lyrica helped her. And her appointments with Dr. Nasseri, Lyrica was for fibromyalgia. She said she was doing well with it. That's what the record tells us.  some of these drugs, these medications in terms of, particularly the opioid ones, you actually have to back down from them because they hurt you. So what is normally presented in terms of it helps you, it hurts. So you're saying because she scaled down, that would mean just the opposite with fibromyalgia. Some of those drugs you have to get off of to get better. So you're using that to say, oh, well, look, she didn't take this as much as that. She was taking that. So it's a very complicated thing. Because it's like one of my favorite things that Mark Twain said. He said, if the only tool you have is a hammer, you'll see all problems being nailed. And that's what that is. The only tool we have is that, no, you need more than the tool box. And that's what the record did. It said, no, there are more tools in the box than just hammers. It's also understanding what this is, and it doesn't present with the hammer and nail concept. Well, there's no indication from this ALJ's discussion that she misunderstood what fibromyalgia was. She didn't rely on objective evidence. She relied on plaintiff's own statements. And in terms of what the ALJ said, again, as I said earlier, the RFC is extremely limiting for a 26-year-old. She is limited to essentially sedentary jobs, and, among other vast limitations, that the ALJ specifically noted in the decision that he was accounting for her complaints of joint pain and fatigue. So, again, when I say this case is not like a rack, that's what I'm talking about in terms of the ALJ actually recognizing the fibromyalgia, giving her a severely limited RFC finding, limiting to sedentary. And, of course, there's just simply nothing in the record to show that her symptoms did wax and wane in a way that a person's fibro who would be disabled by it, it didn't happen here. The record does not show that she had... Well, how can you keep a job if for 8 days of the month you have one or more days where you can't get out of the bed? The record, there's 8 years of treatment records where she never said that happened due to fibromyalgia. It never happened due to fibromyalgia? What difference does it make what it was? Well, the difference is how much the fibromyalgia actually affects her ability to do things. Because you're looking for a quantitative hammer to hit an objective nail. That's the problem. It's like ships passing in the night. That suggests that anybody who has fibromyalgia should automatically be disabled. And that's not what we have here. We have an entire record of treatment notes that cover 8 years that show she was doing fine on her medicine and by 2022 wasn't seeing her rheumatologist at all and was completely off her meds and never complained about bad days of fibromyalgia. That's just not in the treatment records. So that's the basis of saying this case is not similar to a racket. Because you can't treat fibromyalgia, really. You can't. There's no cure to it. Her doctors were treating her with Lyrica. Another provider was treating her with gabapentin. There's treatment remedies that went in here. Because she did have other things. She had co-existing things. Were those treatments you mentioned, were they for fibromyalgia specifically or were they for the lupus or was it like a Venn diagram they were for both? Dr. Nasseri's treatment records indicate that the Lyrica was for fibromyalgia. She was on prednisone and some other medicines related to the lupus. But the record is clear that Lyrica was for fibromyalgia and she did switch at one point to gabapentin, but then at some point ceased medications altogether and was no longer seeing her rheumatologist by the end of the time frame relevant to this case. So I do want to address the treating physician role. What we have here, Dr. Nasseri's opinion, again, tells us nothing about what Ms. Holtz can still do. The form isn't filled out correctly, but we have the records and we have the ALJ's discussion noting that he went through all of Dr. Nasseri's treatment records. He saw this opinion, which tells us almost nothing. He saw the other opinion that's only about lupus, which her counsel suggested was about fibro, but it's not on page 761. And the ALJ talked about all of those treatment records. We also found in our cases that we also reiterate the longstanding law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, the persistence, and limiting effects of their symptoms. Their own subjective complaints. That's what we said in the opinion. She also has given subjective complaints to her doctors that are vastly different than what she testified to in administrative hearings. She's talking to her doctors about being active, about shoveling snow, about going climbing, about being too busy. Counsel, you keep saying as if, like, she's going on the slopes to Vail, Colorado or something. You mentioned that three times now. May I have to call you on that? How many times did you say she went shoveling snow in the record? How many times? There's one reference to it. One reference, and you've said three times that she's shoveling. There's also a reference to climbing. Generic. How many times in the record? Let's talk about the record now, because you've said it three times. I think it needs to be more direct on that. How many times did you say she was climbing in the record? Two different times. Two times. So that's a record of her climbing and shoveling snow once. She rejected steroid injections because she was too busy. But there is no evidence of bad days. That's the issue here. There's no evidence of bad days. If you're representing, that's the record here, that there's no evidence of bad days. Her treatment records do not show evidence of bad days related to fibromyalgia. I believe I have seven seconds left. The ALJ here relied on the substantial evidence in this matter, and we ask the Court to affirm. Thank you. Thank you. Thank you, Mr. Johnson. Mr. Goldick. Thank you, Your Honor. So your questions, Your Honor, go precisely to the point. There has not been, from my review over and over again, there has not been one fibromyalgia case since Arrakis before this Honorable Court that was affirmed. Every case, reported or non-reported, has found that it needed to be remanded because the ALJs refused to follow exactly what you're talking about. There's a lot of pressure on me to make sure I'm not the first one, but the point is, it's the recognition of the severity and of what Arrakis says that prevents those affirmative natures in any of those cases, which is highly unusual. The case that was mentioned, the recent Drummold, I think, was case, that did not involve fibromyalgia. A lot of the opinions that are offered are not, none of them, the only case where it was not accepted was where it was not brought up until it was in the federal court. I do want to get back to Your Honor's question of what marked is because I found the definition. Thank you for asking me that in my opening so that I could find it. According to the regulations for 14.00, which includes the 14.09, marked is defined as meaning signs and symptoms interfere severely with your ability to function. Although we do not require the use of such a scale, marked would be the fourth of a five-point scale from no limitation to mild to moderate to marked to extreme. You may have a marked limitation when several activities or functions are impaired or even when only one is impaired. Also, you need not be totally precluded from performing an activity to have a marked limitation as long as the degree of limitation seriously interferes with your ability to function independently, appropriately, and effectively. In the record, the grandmother of Testify, I always like having not just a claimant testify, but a family member in a severe case. What she testified to, and this is on page 948, she testified that she had to retire and move in with the claimant to take care of her and her family. They moved to a house that was on one story so she would no longer have to walk steps. I do want to make one thing that I noted that is a real problem here, is that on page 945 to 946, which is the opinion of the administrative law judge, at the bottom of the page she goes through SSR 12-2P and she says that Ms. Holtz at the top of page 946, she says, nor does she have a marked limitation in activities of daily living, social functioning, or completion of tasks in a timely manner. Period. End of paragraph. No explanation. This is precisely the kind of building the bridge. There's no bridge here. There's no explanation from the judge at that moment, which was necessary. This is a conclusion, that she doesn't have marked limitations of daily living, social functioning, or completion of tasks. The next paragraph that was needed was specifically to show the reasons. This court has been very clear in Arrakis and even before Dowling and subsequently in Shelley C., the court has made very clear that if you're going to come to this conclusion and you're not going to accept the treating physician or the other findings, you have to explain that. You have to say why in the record she doesn't have those marked limitations. You can't just throw it out as a conclusion. What she does, in fact, is she then starts going through the rest of the ailments. Because if she had looked for it, she could have found it. She could have found it, as we said, in page 617 in Dr. Singh's records. You brought that up, Your Honors, and I think it's very important. She goes to an exam. The doctor finds that she's disabled. The Social Security Administration could have easily sent interrogatories to the doctor to say, now that you've found positive on motor exam, positive on reflexive exam, positive on sensory exam, positive on gait exam, tell us what the limitations are. Instead, two months later, they send her back to the same office to see the other doctor who says, I don't see any objective evidence. Big red flag there. And I think she's malingering. In the three-volume set we have, the only reference to malingering is from that consultative evaluation. There's nowhere else. We go from a doctor who says she's disabled and could qualify why on that exam he found she's disabled. They send her back. And quite frankly, for those of us who do this kind of law, to do that is the ultimate in cherry-picking. You don't like the opinion. You don't ask the doctor for an explanation. You just ignore it and send them back to the same office for the other doctor to say the other way. Dr. Nasseri's evaluation is not in a vacuum. He has said many other times throughout the reports the problems that she tells him about, and that's why she's continued to treat with him. And to the extent that there are those other references, those references as to her condition are precisely what we have to look at and not cherry-pick because she can hike one day. I thank you for your time and consideration of all of the record in our briefs. Thank you. Thank both counsel for that able presentation. We'll come down and greet counsel, and then we'll proceed to our next case.
judges: Roger L. Gregory, G. Steven Agee, Roderick Charles Young